PARKER & McCONKIE
JAMES W. McCONKIE (Bar # 2156)
BRADLEY H. PARKER (Bar # 2519)
Attorneys for Plaintiff
5664 South Green Street
Salt Lake City, Utah 84123
Phone: (801) 264-1950
Email: jwmcconkie@utahlawhelp.com
Email: bparker@utahlawhelp.com

CAIR LEGAL DEFENSE FUND
LENA F. MASRI (DC: 1000019)
GADEIR I. ABBAS (VA: 81161)*
Attorneys for Plaintiff
453 New Jersey Avenue, SE
Washington, DC 20003
Phone: (202) 488-8787
Email: lmasri@cair.com
Email: gabbas@cair.com

*Licensed in VA; not in DC
Practice limited to federal matters

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| **YUSSUF AWADIR ABDI**, | ) | **PLAINTIFF'S RESPONSE TO** |
| | ) | **DEFENDANTS' MOTION TO** |
| Plaintiff, | ) | **DISMISS SECOND AMENDED** |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | |
| **CHRISTOPHER WRAY[1]**, et al., | ) | **Case No.: 2:17-cv-00622-DB** |
| | ) | **Hon. Dee Benson** |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS
## SECOND AMENDED COMPLAINT

---

[1] Christopher Wray, current Director of the FBI, is substituted automatically pursuant to Fed. R. Civ. P. 25(d), and is so named in the caption.

i

NOW COMES Plaintiff, for himself and on behalf of all others similarly situated, through his attorneys, Parker & McConkie and CAIR Legal Defense Fund ("CAIR"), and hereby responds to Defendants' Motion to Dismiss Second[2] Amended Complaint [Dkt. 168]. For the reasons stated in his Brief in Support, Plaintiff respectfully requests this Honorable Court DENY Defendants' Motion to Dismiss Second Amended Complaint.

Respectfully submitted,

*/s/ James W. McConkie*
PARKER & McCONKIE
JAMES W. McCONKIE (Bar # 2156)
BRADLEY H. PARKER (Bar # 2519)
Attorneys for Plaintiff
5664 South Green Street
Salt Lake City, Utah 84123
Phone: (801) 264-1950
Email: jwmcconkie@utahlawhelp.com
Email: bparker@utahlawhelp.com

*/s/ Lena F. Masri*
CAIR LEGAL DEFENSE FUND
LENA F. MASRI (DC: 1000019)
GADEIR I. ABBAS (VA: 81161)*
Attorneys for Plaintiff
453 New Jersey Avenue, SE
Washington, DC 20003
Phone: (202) 488-8787
Email: lmasri@cair.com
Email: gabbas@cair.com

*Licensed in VA; not in DC*
*Practice limited to federal matters*

Dated: January 5, 2018

---

[2] Defendants, presumably by mistake, filed the instant motion as a Motion to Dismiss Second Amended Complaint. However, the Second Amended Complaint [Dkt. 16] is the operative complaint, as opposed to the Second Amended Complaint [Dkt. 164]. Thus, Plaintiff will treat the instant motion as a Motion to Dismiss the Second Amended Complaint.

ii

## <u>TABLE OF CONTENTS</u>

Table of Contents ....................................................................................................... 3

Table of Authorities.................................................................................................... 5

Introduction ...........................................................................**Error! Bookmark not defined.**

Standard of Review ..................................................................................................... 5

Argument ..................................................................................................................... 5

I.      The federal watch list violates Plaintiff's substantive due process right of movement which, though inconvenient to Defendants, actually exists. .................................... 5

   A.      History reflects that the right of movement is inherent to the Due Process Clause. ............................................................................................................ 6

   B.      The text of the United States Constitution and an analysis of the Bill of Rights' penumbras reflects that the right of movement is inherent to the Due Process Clause.  7

   C.      The Selectee List interferes with Plaintiff's right of movement................................ 10

II.     Because the No Fly List and the Selectee List both interfere with the exercise of a fundamental right, strict scrutiny applies. ........................................................................ 12

   A.      Both lists fail strict scrutiny because they lack a compelling government interest. 13

   B.      Both lists fail strict scrutiny because they are not narrowly tailored. .................... 14

III.    The No Fly List and Selectee List deprive Plaintiffs of their procedural due process rights. ....................................................................................................................... 20

A.    Defendants have burdened two critical interests, the right of movement and Plaintiff's stigma-plus interests in his reputation. ..................................................... 21

B.    The risk of erroneous deprivation is almost absolute and attributable to the bottom-of-the-barrel inclusion standard. ................................................................... 28

C.    Defendants have not provided Plaintiff with any process whatsoever. ................. 30

IV.    Plaintiff have adequately pled Equal Protection claims. ..................................................... 31

V.    Defendants do not understand Plaintiff's non-delegation claim. Simply put, Congress never directed Defendants to create a terrorist watch list and then fill it with innocent people federal agents believe will become terrorists in the future. ....................... 35

VI.    This Court has jurisdiction over Plaintiff's claims. ............................................................. 40

VII.    Plaintiff has standing to assert his claims. .......................................................................... 41

Certificate of Service ........................................................................................................................ 43

# TABLE OF AUTHORITIES

Cases

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)................................................................ 14

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000)........................................................ 35

*Conley v. Gibson*, 355 U.S. 41 (1957) .....................................................................................7

*Dewell v. Lawson*, 489 F.2d 877 (10th Cir. 1974) ...................................................................6

*Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001). ........................... 24, 28

*Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394 (11th Cir. 1993)................................ 36

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) ............ 35

*First Nat. Bank v. Bellotti*, 435 U.S. 765 (1978)............................................................. 16, 17

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ..................................................................... 10

*Grutter v. Bollinger,*539 U.S. 306 (2003) ............................................................................ 15

*Hawkins v. Freeman*, 195 F.3d 732 (4th Cir. 1999) .............................................................. 13

*Humphries v. County of L.A.*, 554 F.3d 1170, 1187–88 (9th Cir. 2009) ............................... 28

*Hunt v. Cromartie*, 526 U.S. 541 (1999)) ............................................................................. 35

*Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980)

.................................................................................................................................38, 40

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) .............................................................. 34

*Mitchell v. King*, 537 F.2d 385 (10th Cir. 1976) .....................................................................6

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977) .......................................................... 14

*N. Carolina State Conference of NAACP v. McCrory*, No. 16-1468, 2016 WL 4053033 (4th Cir.

July 29, 2016)............................................................................................................... 36

*Paul v. Davis*, 424 U.S. 693, 701 (1976) ................................................................ 29

*Republican Party of Minnesota v. White*, 536 U.S. 765 (2002) ......................... 15

*S. Carolina Med. Ass'n v. Thompson*, 327 F.3d 346 (4th Cir. 2003) .................. 38

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ................................................. 13, 14

*Siegert v. Gilley*, 500 U.S. 226 (1991). ................................................................ 29

*Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535 (1942) ................. 13, 14

*Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810 (4th Cir. 1995) ................. 36

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) .................................... 35

*Washington v. Davis*, 426 U.S. 229 (1976) .................................................. 34, 36

*Wayte v. United States*, 470 U.S. 598 (1985) .................................................... 35

*Whren v. United States*, 517 U.S. 806 (1996) ................................................... 35

*Yakus v. United States*, 321 U.S. 414 (1944) .................................................... 38

## Other Authorities

49 U.S.C. § 114(h) ..................................................................................... 40, 41, 43

49 U.S.C. 114(h) .............................................................................................. 16

## United Nations Documents

Zechariah Chafee, Jr., *Three Human Rights in the Constitution of 1787* 166 (1956) .................... 9

## STATEMENT OF RELEVANT FACTS

Plaintiff Yussuf Awadir Abdi (hereinafter "Imam Abdi") is a Muslim religious leader and Imam of Madina Masjid Mosque in Salt Lake City, Utah. [Dkt. 16 at 25]. Imam Abdi, a United States Citizen, was wrongfully designated on the federal terrorist watch list and falsely stigmatized as a "known or suspected terrorist" by Defendants. [Dkt. 16 at 25-57]. He was not provided notice of the factual basis for his placement on the watch list. [Dkt. 16 at 54]. Nor was he given notice of the deprivation of his liberty interests or violation of his constitutional rights. [Dkt. 16 at 55]. Most importantly, he has never been arrested, charged or convicted of a terrorism-related offense. [Dkt. 16 at 142].

Sometime in 2014, the federal government placed Imam Abdi on the Selectee List component of the federal terror watch list, having secretly concluded that officials had a "reasonable suspicion" that Imam Abdi was "associated with terrorism." [Dkt. 16 at 26]. Imam Abdi's status on the Selectee List was evident because, for approximately the last three years, every time he traveled by air, he was been unable to check in to his flights online or at the kiosks stationed at the airports. [Dkt. 16 at 27]. Rather, he was directed to check in manually with an airline representative in order to print his boarding pass. [Dkt. 16 at 28]. The airline representative, after pulling up his name on the computer system, would contact the Department of Homeland Security in order to obtain clearance so that he could fly. [Dkt. 16 at 29]. Once clearance from the Department of Homeland Security is obtained, the airline representative would then print his boarding pass, which would be stamped with the "SSSS" designation, indicating that he has been designated as a "known or suspected terrorist." [Dkt. 16 at 30]. Imam Abdi was then subjected to routine secondary inspections, prolonged searches and questioning every time he traveled by air. [Dkt. 16 at 31].

1

However, on June 14, 2017, Imam Abdi appeared at Jomo Kenyatta International Airport in Nairobi, Kenya to board a commercial flight back to his home in the United States. [Dkt. 16 at 34]. Because his visa petitions that he filed for his wife and two of his children had just been approved, Imam Abdi had traveled to Kenya to bring his wife and five children with him to the United States. His remaining three children are United States Citizens. [Dkt. 16 at 35]. Upon information and belief, the immigration application, which was submitted in 2012, that Imam Abdi filed for his wife and two of his children was processed differently because of his status on the terror watch list. [Dkt. 16 at 36]. After that immigration application was approved in 2013, Imam Abdi's family's visas were not approved for several years – not until May 2017—an adjudication process that was also lengthened because of his status as a listee. [Dkt. 16 at 36].

Imam Abdi once again was unable to check in at a kiosk stationed at the airport, and presented himself at the Qatar Airlines counter. [Dkt. 16 at 37-38]. Although his wife and children were able to print their boarding passes, the Qatar Airlines representative told Imam Abdi that the United States would not allow him to board his flight in order to return to his home in the United States. [Dkt. 16 at 39]. Upon information and belief, Imam Abdi was upgraded from the Selectee List to the No Fly List after he arrived in Kenya. [Dkt. 16 at 40]. As a result, he was extrajudicially exiled from his country of citizenship, the United States.

Imam Abdi rescheduled his flight to the United States to leave later that evening. [Dkt. 16 at 43]. It was only after the filing of the instant complaint that the federal government allowed him to board this flight to the United States. [Dkt. 16 at 44]. However, upon arriving at the Los Angeles International Airport, Defendants detained Imam Abdi for lengthy screening which forced him to miss his flight to Salt Lake City. [Dkt. 16 at 44]. On June 18, 2017, after another lengthy screening at the Los Angeles International Airport, Imam Abdi was again almost

2

prevented from boarding his flight. [Dkt. 16 at 45]. The pilot, however, refused to depart without Imam Abdi and his family, and they were eventually allowed to board the flight. [Dkt. 16 at 45]. Imam Abdi and his family arrived in Salt Lake City on June 18, 2017 by plane. [Dkt. 16 at 45].

Since then, Imam Abdi has flown on three separate occasions, facing humiliating and stigmatizing treatment each time as a result of having been added once again to the Selectee List. [Dkt. 16 at 47-48]. Each time, Imam Abdi was unable to print his boarding pass, was required to obtain clearance to print his boarding pass and board his flights, and his boarding passes were once again stamped with the "SSSS" designation. [Dkt. 16 at 49]. Additionally, when Imam Abdi would proceed to the security checkpoint with his boarding pass, TSA agents would shut down the entire screening line and Imam Abdi would be required to proceed through the checkpoint by himself, several TSA agents would thoroughly check his luggage, and the TSA agents would huddle amongst themselves and make a phone call to obtain clearance and allow Imam Abdi to proceed to the gate. [Dkt. 16 at 51]. When Imam Abdi would arrive to the gate, he would be met with approximately half a dozen TSA agents waiting to screen him in front of everyone. [Dkt. 16 at 52]. Each time this occurred, Imam Abdi felt stigmatized and humiliated in front of the other passengers that were clearly fearful of him after witnessing what was happening to him. [Dkt. 16 at 53].

The watch list has two primary components: the selectee watch list and the No Fly list. [Dkt. 16 at 59]. Persons on the selectee watch list are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes printed by airline employees which is marked to indicate a passenger's watch list status as a "known or suspected terrorist" to airline employees and screeners. *Id.* On the other hand, persons on the No

3

Fly List are prevented from boarding flights that fly into, out of, or even through United States airspace. *Id.*

Upon information and belief, Defendants disseminated the records of Plaintiff from their terrorist watch list to other government agencies, including the TSA for use by airlines in pre-screening Plaintiff, and CBP for use in screening Plaintiff when attempting to return to the United States. [Dkt. 16 at 61]. Upon information and belief, Defendants' intention in disseminating watch list records, including that of Plaintiff, as widely as possible, is to constrain his movements, not only within the United States, but abroad as well. [Dkt. 16 at 62-63]. As a result, Plaintiff, as a result of being designated as a "known or suspected terrorist," is presumed to be dangerous and a violent menace, and is treated as such. [Dkt. 16 at 4]. Additionally, Defendants disseminate the federal watch list to both government authorities and private corporations and individuals with the purpose and hope that these entities and/or individuals will also impose consequences on those individuals Defendants have listed, including Plaintiff. [Dkt. 16 at 66]. In fact, many listees' ability to access the financial system was imperiled as a result of Defendants' actions in designating them as "known or suspected terrorists" and disseminated the false stigmatizing label to financial institutions. [Dkt. 16 at 67]. As a result, banks have closed the bank accounts of individuals listed on the federal watch list and financial companies have declined to allow these listed individuals to make wire transfers. [Dkt. 16 at 68]. Moreover, family-based immigration applications filed by Plaintiff and similarly situated American citizens are delayed due to an "FBI name check" and not adjudicated, thereby denying Plaintiff and similarly situated American citizens of the rights that flow from citizenship, including the ability to sponsor for lawful permanent residency immediate relatives living abroad. [Dkt. 16 at 68]. The federal government, through Defendants, also disseminates its federal watch list to state and

local police officers which allows those officers to query the names of persons, if for example, the listed individual is pulled over for routine traffic violations. [Dkt. 16 at 75]. Disseminating the federal watch list to state and local police officers creates a dangerous situation insofar as the federal watch list effectively directs state and local officers to treat thousands of Americans charged or convicted with no crime yet listed as a "known or suspected terrorist" and as extremely dangerous. [Dkt. 16 at 76]. In fact, with the advent and deployment of automatic license plate readers by police departments across the country, local and state authorities have relied heavily upon a driver's watch list status as the basis of a traffic stop. [Dkt. 16 at 77].

## STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12b(6), Federal Rules of Civil Procedure, the factual allegations of a complaint must be taken as true and all reasonable inferences must be indulged in favor of the plaintiff. *Mitchell v. King*, 537 F.2d 385 (10th Cir. 1976); *Dewell v. Lawson*, 489 F.2d 877 (10th Cir. 1974). A complaint should not be dismissed unless it appears beyond a doubt that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## ARGUMENT

I.    **The federal watch list violates Plaintiff's substantive due process right of movement which, though inconvenient to Defendants, actually exists.**

Defendants' argument against the existence of a right of movement, which encompasses domestic and international travel, provides nothing more than a depressing and pessimistic account of the strength of our constitutional rights. But the matter is simple: *Glucksberg* controls the outcome of this claim, and following the steps outlined in *Glucksberg* leads to the inescapable conclusion that there is a right of movement in the Constitution and the watch list violates it. As the Fourth Circuit Court observed in *Mohamed,* "the general right of free

movement is a long recognized, fundamental liberty." *Mohamed v. Holder*, Civil Action No. 1:11-cv-50 (AJT/MSN), 2015 U.S. Dist. LEXIS 92997, at *20 (E.D. Va. July 16, 2015). And as the Supreme Court previously observed, "[f]reedom of movement is basic to our scheme of values." *Kent v. Dulles,* 357 U.S. 116, 126 (1958). This language is unequivocal.

But setting aside the clarity of these statements and conducting the analysis anew, though tedious, produces the same outcome. To determine whether Plaintiff's freedom of movement is protected by the Fourteenth Amendment's substantive due process guarantees, the Supreme Court requires courts to follow its "established method of substantive-due-process analysis" which has "two primary features." *Glucksberg*, 521 U.S. at 721. The first step is to "carefully formulat[e] the interest at stake." *Id.* at 722. The second step is to determine whether the freedom in dispute is among those "fundamental rights and liberties" rooted in our country's history. *Id.* at 720-721. Because the formulation of the interest[3] at stake requires this Court to determine "the most specific level at which a relevant tradition protecting, or denying protection to, the asserted right can be identified," both steps of the *Glucksberg* analysis are contained within the historical and precedential review that follows. *Michael H. v Gerald D.,* 491 U.S. 110, 127 (1989).

A. <u>History reflects that the right of movement is inherent to the Due Process Clause.</u>

The historical examination *Glucksberg* requires this Court to make is, by necessity, broad. For example, in *Glucksberg*, the Supreme Court analyzed the present and past laws of the fifty states, as well as laws of other countries, in order to frame its historical examination. *Id*. at 710-711. In this case, this Court should consider the history of the right of movement between

---

[3] Defendants pretend as if the Supreme Court has never mentioned the existence of a constitutional right to movement. This, of course, is fiction. "This Court long ago recognized that the nature of our federal union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement." *Shapiro v. Thompson,* 394 U.S. 618, 629 (1969).

the states, as well as between this country and others, in framing its examination. This examination of the country's traditions is also meant to be probing. In *Glucksberg*, the Supreme Court analyzed centuries-old historical treatises, changes in the law between now and the founding of the colonies, and evidence of social attitudes in the colonies. *Id*. at 711-715.

An examination of the country's traditions conducted in accordance with *Glucksberg* would reveal that the right of movement is firmly embedded within the American tradition. To begin with, the desire for more freedom of movement is what led many of our forebears to embark on the treacherous journey from Europe to the New World. Many English colonists were motivated by "[t]he unhappiness and frustration caused by the various restrictions on freedom of movement in England." Zechariah Chafee[4], Jr., *Three Human Rights in the Constitution of 1787* 166 (1956). While in England, these same colonists could only move from town to town with permission from various authorities. *Id*. at 164. Religious discrimination in England also motivated some colonists and amplified the deleterious effect of movement restrictions. *Id*. at 175. While the right of movement was not enumerated in the Constitution, this is because the Founders saw that the right "was already embodied elsewhere" in the text. *Id*. The existence of the right of movement in the Constitution, with a presence that saturates the entire document but especially the Bill of Rights' penumbras, is beyond dispute and is established below.

> B. The text of the United States Constitution and an analysis of the Bill of Rights' penumbras reflects that the right of movement is inherent to the Due Process Clause.

The number of enumerated rights that presume a freedom of movement is an indication that, although the right of movement is unenumerated, the Constitution confers it. To begin with, it is beyond dispute that the text of the Constitution has been interpreted as protecting freedoms

---

[4] In *Kent v. Dulles*, the Supreme Court relied extensively on Professor Chafee's work—which provides this Court with good reason to follow Chafee's analysis.

not specifically enumerated. In *Griswold v. Connecticut*, for example, the Supreme Court recognized an unenumerated fundamental right: the right to privacy. *Griswold v. Connecticut*, 381 U.S. 479, 481-86 (1965). The Court's process of arriving at this recognition began with an examination of the country's legal traditions and concluded that certain fundamental rights can be inferred from existing traditions and the Constitution's text. *Id*. at 482-484 ("[t]he foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras"). The manner in which *Griswold* uncovered the constitutional right to privacy is germane to the present matter. The Supreme Court identified the right of privacy within the "penumbras" of the Bill of Rights by charting recognized fundamental rights which tacitly include or require the right of privacy to be constitutionally guaranteed. *Id*. For example, the Court analyzed a number of First Amendment cases dealing with "the freedom to associate and privacy in one's associations." *Id*. at 483. That right did not appear explicitly in the First Amendment, but still existed as a "peripheral First Amendment right." *Id*. at 483. The Court mentioned other explicit constitutional guarantees which arguably include a privacy component: the Third Amendment, prohibiting quartering of soldiers, the Fourth Amendment, prohibiting searches and seizures, the Fifth Amendment prohibiting self-incrimination, and the Ninth Amendment reserving unenumerated rights to the People. *Id*. at 484. These amendments, along with the freedom to associate found in the First Amendment, create "zones of privacy." *Id*. These "zones of privacy" point to the existence of a more fundamental and basic right of privacy, a right which itself gives "life and substance" to the Constitution's explicit guarantees. *Id*.

Like the right of privacy in *Griswold*, the right of movement at issue in this case is basic and far-reaching in nature—the right of movement is simply necessary to the practicing of democracy and the functioning of a healthy society. Just as the Supreme Court in *Griswold*

recognized "zones of privacy" in threading together various constitutional guarantees, this Court should recognize zones of movement emanating from various constitutional guarantees. It is clear from this nation's legal traditions that such a right exists, and the "penumbras" of the Bill of Rights suggest and imply that right as well. Article IV of the Constitution entitles citizens of one state to the privileges and immunities of all the states. Article IV clearly recognizes a zone of movement because it guarantees equal treatment for citizens moving from one state to another state, a guarantee that would be unnecessary if the Founders did not consider such movement essential to the healthy functioning of the United States.   Article I of the Constitution gives Congress the ability to regulate interstate commerce, and commerce with foreign states. This authorization anticipates a zone of movement as well: the movement of goods and people between states and between the United States and other countries. The First Amendment, which guarantees the right to assemble, implies a zone of movement: citizens must move between states, and from other countries to this country, in order to freely assemble. The First Amendment also guarantees the right to free exercise of religion. This guarantee implies a separate zone of movement: for many citizens, movement is a necessary component of free exercise of religion. Aside from congregating regularly with members of their faith at a site of worship, many religions encourage pilgrimage in foreign countries. For example, Catholics travel to the Vatican, Jews to Israel, and Muslims to Mecca.

More broadly, the Ninth Amendment reserves unenumerated rights to the People. Put differently, the fact that the right of movement is not enumerated does not foreclose on the existence of that right. Rather, the historical record makes clear the right of movement is so fundamental and basic that it was not necessary to dedicate explicit text to the right. Indeed, our constitutional scheme—from the Commerce Clause to the Bill of Rights, from federalism to the

Citizenship Clause—presupposes the existence of a right of movement. Simply put, these various and explicit constitutional guarantees point to an underlying right: the right of movement. The zones of movement found within these guarantees extend from that underlying right. The zones of movement, when considered in tandem with our nation's constitutional scheme and history, provide clear evidence of the Founders' intent to enshrine the right of movement as a part of the Constitution.

### C.  The No Fly List interferes with Plaintiff's right of movement.

Defendants' inclusion of Plaintiff on the No Fly List violates Plaintiff's right to movement because it "significantly interferes with the exercise of a fundamental right." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978). It was only after the filing of the instant lawsuit that Defendants removed Plaintiff from the No Fly List. In *Zablocki*, Wisconsin passed a statute that burdened the right to marry. *Id.* at 375. The statute conditioned access to the right to marry on an individual's ability to comply with legal obligations to support offspring not in his custody. *Id.* The Court noted that the statute's burden varied among different groups of individuals with unsatisfied support obligations. Bearing the heaviest burden, the destitute were "absolutely prevented" from exercising their fundamental right to marry. *Id.* at 387. The court also found that individuals, whose financial outlook preserved some discretion in the matter, may still be "sufficiently burdened" by the statute to "forgo their right to marry." *Id.* Finally, the court found that even those who would pay the support obligations and receive a marriage license still suffer a "serious intrusion into [a] freedom… [the Court has] held…to be fundamental." *Id.* The court found that in all cases—irrespective of whether the statute actually prevented someone from exercising the right to marry—the law "interfered with the exercise of a fundamental right." *Id.* at 388.

The federal government's watch lists replicate the same impermissible dynamics declared unconstitutional in *Zablocki*. Though still technically possible, Plaintiff's status on the No Fly List prevents him from traveling overseas or even across our country. The No Fly List prevents Plaintiff from attending professional gatherings, going on vacation, performing religious pilgrimage, among numerous other constraints. Indeed, the federal government's No Fly List will prevent completely an entire class of citizens who are too elderly, feeble, or destitute to travel by means other than air travel from exercising their right of movement. There are many grandmothers and grandfathers who, though they may not be able to traverse North America by land, could do so by plane. In reality, and in spite of the government's repugnant arguments to the contrary, it is an inescapable fact that air travel is a facilitator of movement. Without air travel, a citizen's right of movement is constrained—the No Fly List reduces the ability of citizens the right.

Even if this Court considers the effect of the federal government's actions to be the lesser intrusion of forcing Plaintiff to take a circuitous returning route over land and sea, it would still constitute, under *Zablocki*, an impermissible "serious intrusion" into Plaintiff's right of movement. 434 U.S at 387. This is because the condition Defendants place on Plaintiff's fundamental right—that they may, for instance, return to the United States from abroad or travel to a state but not on an airplane—is more of an obstacle than the condition *Zablocki* found unconstitutional. Defendants' actions impose on Plaintiff the same impermissible obstacle in *Zablocki*—a monetary outlay that was previously unrelated to the exercise of the right—in addition to a substantial increase in the amount of time and physical endurance Plaintiff would need to exercise their right of movement. Defendants' inclusion of Plaintiff on the No Fly List creates a substantial obstacle to Plaintiff exercising his right of movement.

11

D.  The Selectee List interferes with Plaintiff's right of movement.

The Selectee List violates Plaintiff's right of movement in a more subtle manner than the No Fly List. While the No Fly List inflicts a flight ban, the Selectee List makes some forms of travel so painful that listees will elect to forgo exercising their travel rights. But beyond deterring travel, the Selectee List—because it is disseminated internationally—is the government's attempt to directly regulate international movement. Defendants disseminate the Selectee List to more than 40 countries and do so "with the purpose and hope that those foreign governments will constrain the movement" of listees in some manner. [Dkt. 16 at 63]. Foreign governments will be unlikely to grant visas to the Plaintiff. Many countries, including Canada, Great Britain, Turkey, Kenya, Kuwait, and Qatar among others, either prohibit listees from entering, detain listees upon entering, or impose other consequences that makes international travel to those countries while on the Selectee List very dangerous.  As the Supreme Court held, [i]f a law has no other purpose…than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional." *Shapiro v. Thompson,* 394 U.S. 618 (1969).

## II.  Because the No Fly List and the Selectee List both interfere with the exercise of a fundamental right, strict scrutiny applies.

Strict scrutiny is "essential" where government action interferes with "basic civil rights." *Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 5x41 (1942). When an asserted right is deemed "fundamental," that interest is "entitled… to the protection of strict scrutiny judicial review of the challenged legislation." *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999). The Due Process Clause provides "heightened protection against government interference with certain fundamental rights," *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and interference with a Due Process fundamental right "warrants the application of strict scrutiny." *Bostic v. Schaefer*, 760 F.3d 352, 375 (4th Cir. 2014). The Supreme Court has only ever applied

12

strict scrutiny in cases dealing with fundamental rights. *See*, e.g., *Skinner*, 316 U.S. at 541 (fundamental right under Equal Protection Clause), *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (fundamental right of household decisions under Due Process Clause), *Zablocki v. Redhail*, 434 U.S. 374 (1978) (fundamental right of marriage under Due Process Clause). *See also, Shapiro v. Thompson*, 394 U.S. 618, 634 (1969).

As the Fourth Circuit Court, after a discussion that situated the right of movement within the substantive due process protections announced in *Kent v. Dulles,* previously explained, the No Fly list implicates the fundamental right of movement. ("The general right of free movement is a long recognized, fundamental liberty" and "[a]t some point, governmental actions taken to prevent or impede a citizen from reaching the border infringe upon the citizen's right to reenter the United States."). *Gulet Mohamed v. Eric R. Holder, Jr., et al*. Case No. 11-cv-00050 (2011)), Dkt. 1689, Page ID # 2294; Dkt. 70, Page ID #1099-1100. For similar reasons, the Selectee List's international dissemination likewise infringes upon the right of movement. And that right falls squarely within the ambit of the Due Process Clause. *Shapiro*, 394 U.S. at 634. Strict scrutiny must apply, then, because it is necessary to provide the "heightened protection" described by the Supreme Court in *Washington v. Glucksberg*. 521 U.S. at 720.   Thus, the No Fly List and the Selectee List are illegal unless they are "narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S. Ct. 1439, 1447 (1993).

A.  Both lists fail strict scrutiny because they lack a compelling government interest.

Defendants claim that their watch list exists to promote aviation and national security. However, the watch list has failed to list any of the actual perpetrators of terrorism such as the Boston Bombers, the San Bernadino Shooters, the Orlando Shooter, the Ohio State University attacker, the Shoe Bomber, the Underwear Bomber, among others. Plaintiff's   allegations   are

13

well pled and supported by specific facts that give rise to the inference that the watch list's purpose is more about recruiting informants than protecting planes. In fact, as Plaintiff alleges, Defendants watch list some individuals even though they are not "subject to an ongoing investigation." [Dkt. 16 at 7]. Because the watch list's purpose is really the recruitment of informants, the government lacks the compelling interest required to satisfy strict scrutiny.

B.   Both lists fail strict scrutiny because they are not narrowly tailored.

A regulation that burdens fundamental rights must be narrowly tailored to further compelling governmental interests. This requirement ensures such regulations are "specifically designed and narrowly framed to accomplish" the purpose underlying the regulation. *Grutter v. Bollinger,* 539 U.S. 306, 333 (2003) (internal quotation marks and citation omitted). The narrow tailoring analysis asks whether the regulation at issue applies to all and to only relevant conduct as "evidenced by factors of relatedness between the regulation and the stated governmental interest." *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002). A regulation is not narrowly tailored if the regulation is underinclusive. An underinclusive regulation leaves "significant influences bearing on the interest unregulated." *Id*. Similarly, a regulation is not narrowly tailored if the regulation is overinclusive because it "sweep[s] too broadly." *Id*.

The government relies on two compelling interests to justify its use of the No Fly List and Selectee List. The governing statute, 49 U.S.C. 114(h), invokes these interests disjunctively by authorizing the TSA to prevent, take action against, or notify law enforcement of "individuals on passenger lists who may be a threat to civil aviation *or* national security" from boarding airplanes. *Id*. at 114(h)(3)(A) (emphasis added). Where the government invokes two compelling interests in justifying a law that interferes with fundamental rights, the Supreme Court has analyzed the interests separately. *First Nat. Bank v. Bellotti*, 435 U.S. 765, 788-795 (1978). In order to be narrowly tailored, these lists must neither leave unregulated "significant influences

14

bearing on" aviation security and national security nor "sweep too broadly" by affecting conduct that does not bear on those interests. *Id.* at 788-795.

### i.       The lists are underinclusive.

Government action can be underinclusive by not regulating significant influences bearing on the interests at issue in at least a few ways. First, it is possible that the government action produces results adverse to governmental interests. Such action would be clearly underinclusive. It would magnify harmful influences bearing on compelling governmental interests rather than limit those influences. Second, government action may incompletely regulate harmful conduct bearing on the interest. Laws of this nature would be underinclusive if the unregulated conduct is significant with regard to the law's underlying purpose. Third, the regulation at issue inadequately addresses the conduct relevant to the stated governmental interest. Government action such as this would be underinclusive because the regulated conduct would continue unabated notwithstanding the government's interference with a fundamental right. The No Fly list is underinclusive for each of these three reasons.

First, both lists produce results adverse to national security and are underinclusive as a result. The watch list requires the government to disclose its investigative interest in suspected terrorists who attempt to fly or travel across the border. In *Mohamed,* the Government freely admits that disclosure of investigative interest actively harms national security. United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011), Dkt. 167 at Ex 5 – Steinbach Decl, ¶ 13. The Government offers multiple reasons as to why this disclosure is harmful: the disclosure could enable evasion by the subject, endanger law enforcement agents, and encourage a subject to accelerate plans for an attack. *Id.* at ¶ 13-14. Unless a particular individual who is considered a suspected terrorist poses a discrete threat to aviation security, the

lists actually work against national security by enabling harmful conduct unassociated with air travel. Similarly, an individual who attempts and succeeds to board an airplane would know that they are not on a watch list. If that individual was actively planning a terrorist operation, that piece of knowledge would be an invaluable assurance. Put differently, the existence of the watch list provides would-be terrorists the opportunity to determine to some extent whether the federal government has an investigative interest in them.

This adverse effect is an independent reason to conclude the law is not narrowly tailored. In *First Nat. Bank v. Bellotti*, the Supreme Court rejected a law that infringed on a fundamental right because the law adversely affected the compelling interests it was meant to serve. *First Nat. Bank v. Bellotti*, 435 U.S. 765, 788-795 (1978). The law at issue purported to limit corporate contributions in voter referendums in order to preserve individual voter participation, but such corporate contributions could also enhance voter participation. *Id.* Here, the Government purports to improve national security by preventing suspected terrorists from boarding, but also admits that doing so could harm national security in a few different ways. Like the *Bellotti* case, by the federal government's own logic, the watch list does not serve the interests at which it is aimed; in fact, the No Fly List and Selectee List harms those interests and makes us all less safe. Next, the No Fly and Selectee list incompletely regulate harmful conduct bearing on national security. The watch list only pertains to movement by plane or across the border. This singular focus neglects other forms of movement, such as train, bus, or motor vehicle, which equally implicate national security—if the legislative and executive branch rationales for the watch list are to be believed. This incongruity renders the list prima facie underinclusive, especially when one considers the ability of a terrorist to use the watch list to discover whether the Government suspects them of terrorist activities.

The watch list is also underinclusive, because its predictive-preventive model of listing is "no more effective than a list of randomly selected individuals." [Dkt. 16 at 116]. Of all the perpetrators of terrorist acts inside the United States in the last decade, only "one of these perpetrators was designated on the federal terror watch list…prior to their criminal conduct," though that person—Omar Mateen—"was removed from [the List] prior to perpetrating his terrorist attack." [Dkt. 16 at 119]. Simply put, Defendants' watch listing system is incapable of watch listing actual terrorists.

Finally, the watch list inadequately addresses what relevant conduct it does regulate in furtherance of national security. The watch list is inadequate because it is easily evaded. The federal government has effectively conceded this point, when it produced evidence in another watch list case describing how an individual on the watch list who discovers they are on the watch list could employ "countermeasures" to avoid detection, "[alter] his appearance," or "[obtain] a new identification" to avoid the watch list. United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011), Dkt. 167 at Ex 5 – Steinbach Decl, ¶ 13. The federal government also points out that an individual who discovers they are *not* on the list by attempting and succeeding to board an airplane would gain a similar advantage over law enforcement. *Id.* at ¶ 16. In other words, the government concedes that the watch list is inadequate and easily evaded with regard to individuals who are on the watch list, and inadequate and easily evaded with regard to individuals who are not on the watch list.

The ease with which the watch list can be evaded, as evidenced by the government's own declarations, undermines national security. As the Supreme Court explained in *Brown v. Entertainment Merchants Ass'n*, a law that infringes on a fundamental right but is easily undermined by evasion cannot stand. In that case, the Court struck down a law that imposed

restrictions on the sale of violent video games to minors because it was easily evaded. *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. at 2740. The Court reasoned that other forms of violent media undermined the government's interest in restricting the sale of violent video games. *Id.* Furthermore, the Court reasoned that allowing a parent to purchase violent video games for children undermined the law. *Id.* Finally, the Court pointed out how easy it would be to evade even the need for the parental purchase: the law did not provide for verification of the parent-child relationship. *Id.* Like the easily evaded law at issue in *Brown*, multiple layers of evasion undermine the operation of the watch list. An individual on the watch list can travel by another means, which the watch list would not prevent or screen against. If the individual wanted to fly, the individual could alter his or her appearance or obtain another identification, benefitting from the government's disclosure of investigative interest. Finally, the individual could use the existence of the watch list as a way of discerning whether the Government suspected the individual of terrorist sympathies. These methods of evasion render the watch list seriously underinclusive.

> ii.       *Both lists are overinclusive.*

The watch list is overinclusive because of what the watch list actually prevents, who the watch list includes, and who the watch list fails to exclude: the watch list captures mostly legal conduct, classifies individuals on the basis of predictive judgments that perform similarly to a system based on randomized inclusion, and includes Plaintiff who the federal government cannot articulate any reason to believe they pose a threat to U.S. aviation.

Individuals on the No Fly List cannot fly for any purpose, including to engage in lawful, constitutionally-protected activities such as attending political and religious gatherings as well as traveling to take part in professional activities, weddings, funerals, and vacations. Individuals on

the Selectee List are screened at airports and borders even when defendants possess no information from which to infer that they intend an act of violence. These lawful, constitutionally-protected activities do not implicate either U.S. national security in general or aviation safety in particular, but individuals on the watch list are nonetheless prevented from participating in such activities or screened in a manner not related in any way to the information the government possesses. This result is particularly absurd when one considers the ability of an individual on the watch list to travel by train or bus.

The watch list is also overinclusive because of who it includes: the watch list includes individuals not just on the basis of previous conduct, but also expected future conduct with respect to the No Fly List and present associations with respect to the Selectee List. See *Gulet Mohamed v. Eric R. Holder, Jr., et al.* (United States District Court, Eastern District of Virginia, Case No. 11-cv-00050 (2011)), Dkt. 1689, Page ID # 2288 (noting that placement on watch list reserved for individuals that "pose[] a threat of committing" certain acts rather than simply individuals who are in the process of committing those acts). *See also,* Watch Listing Guidance (the Selectee List's inclusion standard requires derogatory information that the listee is "associated with "TERRORIST ACTIVITY.") Though the burden of narrow tailoring belongs to the government, there is no evidence that the agencies can muster to demonstrate that it has the ability to predict who will commit acts of terrorism with even a modest amount of accuracy. There is also no evidence that individuals "associated" with suspect persons or suspect organizations are themselves more likely to commit an act of terrorism. In other words, the inclusion of individuals on the basis of a prediction and association renders the list overinclusive, because many individuals—in fact, probably almost all—on the watch list have actually done nothing wrong.

And this problem of overinclusiveness is attributable not to the particular way in which the government administers the watch list; it is inherent to the watch listing system Defendants have built and now grow as well as the problem—that there are future terrorists lurking among us, or stated differently, that there are some innocent Americans with an elevated propensity to commit terrorism—at which the watch list is aimed. Indeed, a quantitative analysis[5] of the watch list reveals that, based on its processes and performance over the last decade, the watch listing system is unable to watch list the persons who, if listed, would further the watch list's stated objectives. Publicly available information reveals that only one of the one million persons Defendants have placed on their watch list were placed there prior to commencing his terrorist act in the United States. This fact allows for a quantitative analysis[6] that concludes that Defendants' watch listing system "would perform similarly if inclusion on the watch list was done via random selection instead of existing inclusion standards." [Dkt. 16 at 128].

### III.   The No Fly List and Selectee List deprive Plaintiffs of their procedural due process rights.

To establish a due process violation, a plaintiff has to demonstrate that he had a protected interest, that the defendant deprived him of that interest, and that the deprivation was without due process of law. *Sunrise Corp. of Myrtle Beach v. City of Myrtle Beach*, 420 F.3d 322, 328 (4th Cir. 2005). "The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case." *Washington v. Harper*, 494 U.S. 210, 229 (1990); *see also United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) (explaining that whether notice is adequate depends on the facts of each case). If a government deprivation concerns an interest protected by the Due Process Clause, a court must

---

[5] The facts upon which this quantitative analysis is based are laid out in paras. 132-142 of the Amended Complaint. [Dkt. 16].

weigh three factors to determine what process is due: (1) "the private interest that will be affected by the official action, (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

In sum, the government has deprived or substantially burdened Plaintiff of his right of movement, his reputational interests accorded by the stigma-plus doctrine, as well as imposed a host of specific disabilities—from not being able to purchase a gun in states like New Jersey to not being able to work in the sterile areas of airports—onto listees. The risk of erroneous deprivation is effectively perfect insofar the watch list, apparently, has not included any of the actual perpetrators of terrorism over the last decade. Substituting a common sense requirement that Defendants charge or arrest a person prior to listing them will lower the risk of erroneous deprivation. Thus, the *Mathews* factors counsel a comprehensive and assertive judicial intervention against the watch list.

    A.   <u>Defendants have burdened two critical interests, the right of movement and Plaintiff's stigma-plus interests in his reputation.</u>

As this brief has already made clear, both the Selectee List and the No Fly List interfere with Plaintiff's right of movement—a fundamental right that can be traced back to the Magna Carta. It goes without saying that the No Fly List's flight ban violates this fundamental right of movement by preventing individuals from utilizing one whole form of transportation. But the Selectee List, likewise, violates Plaintiff's right of movement insofar as its international dissemination is for the purpose of restricting Plaintiff's ability to travel abroad. For these

reasons, the watch list violates Plaintiff's right of movement, which includes their right to undertake domestic and international travels.

Plaintiff's reputational interests are also burdened. To satisfy the stigma-plus doctrine, which establishes constitutional protections against government defamation, plaintiffs must show a "stigmatic statement" by the government accompanied by "state action that distinctly alter[s] or extinguishe[s]" the defamed's status or otherwise burdens his interests. *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012). A stigmatic statement is any statement that "might seriously damage his standing and associations in his community.*" Bd. of Regents v. Roth*, 408 U.S. 564, 573, 92 S. Ct. 2701, 2707 (1972). Because the defamatory statement must affect one's standing, some type of dissemination or publication of the statement must be demonstrated. And the requirement for state action beyond the defamation is simply "other government action adversely affecting the plaintiff's interests." *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d at 55 (2d Cir. 2001).

> i.     *The widespread dissemination of the watch list and its publicly identifiable consequences constitute a publication that satisfies the stigma-plus prong.*

The Government overstates the dissemination requirement of a stigma-plus claim, arguing that Plaintiffs must show that the stigmatizing statement was made available to the "general public." Dkt. 28 at 33. But no court anywhere has ever declared such a requirement, and defendants cite no authority and concoct no rationale as to why this Court should adopt this novel threshold. Existing precedent, however, indicates that there should be no general public accessibility requirement. This Court previously explained that the "Fourth Circuit has recognized in at least one case a "'constitutional' harm based on the inclusion of defamatory information in a non-public government file if there is a 'likelihood' of dissemination to the

public." *Mohamed v. Holder*, No. 1:11-cv-50 (AJT/TRJ), 2011 U.S. Dist. LEXIS 96751, at *20-22 (E.D. Va. Aug. 26, 2011) citing *Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007). And as the Second Circuit explained, the appellate courts who have confronted this dissemination issue—including the Seventh, Eighth, Tenth, and D.C. Circuit Courts—have all concluded that this dissemination requirement is satisfied even "where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed." *Brandt v. Bd. of Coop. Educ. Servs., Third Supervisory Dist.,* 820 F.2d 41, 45 (2d Cir. 1987). Thus, even an internal dissemination of a stigmatizing statement is sufficient to satisfy the stigma prong.

Plaintiff has alleged that Defendants disseminate their watch list beyond the federal government to "state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, the captains of sea-faring vessels, among other official and private entities and individuals." [Dkt. 16 at 70, 73]. The startling breadth of this dissemination, which is alleged in this lawsuit but not in other TSDB litigation cited by the government, emanates from the watch list's original directive. HSPD-6 directs Defendant Johnson to facilitate the use of the watch list "to support…private sector screening processes that have a substantial bearing on homeland security." HSPD-6, Para 4. This executive order also envisioned that the watch list would be used by "state, local, territorial, tribal, [and] foreign government[s]." *Id.* Defendants have followed through on this directive. As of September 2015, the United States has "signed agreements with more than 40 countries to swap terrorist watch list data." House Report[7], 28. Defendants disseminate this information internationally with the goal that "foreign governments will constrain the movement" of listees. [Dkt. 16 at 55]. Police officers across the country also have easy access to the List's contents. As the Baltimore Police Department recently explained, the watch list "is automatically linked to the National Crime

---

[7] https://homeland.house.gov/wp-content/uploads/2015/09/TaskForceFinalReport.pdf

23

Information Center (NCIC) and is always accessible." Policy 802[8]. The extent of the external dissemination of the watch list is staggering and satisfies whatever dissemination requirement this Court finds applicable.

Beyond dissemination, a person's watch list status—because of its tangible and public consequences—will become known to others. In *Mohamed*, this Court previously concluded that "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines." *Mohamed v. Holder*, Civil Action No. 1:11-cv-50 (AJT/MSN), 2015 U.S. Dist. LEXIS 92997, at *22-23 (E.D. Va. July 16, 2015). This is because Defendants impose their flight ban at the airport and "any member of the general public who would actually witness a person being excluded from boarding might draw an adverse inference concerning that person's reputation." *Id.* This Court also noted that "a person's inability to fly would become known to…a person's actual or prospective employer who would call upon that person to travel by air, or to extended family members whom a person might not be able to visit except through air travel, or to members of religious, professional or social organizations in which participation might require air travel." *Id.* The same logic applies to individuals on the Selectee List, who are handcuffed at the border and detained for hours repeatedly as well as those who are searched each time they pass through the airport. When crossing the border, these individuals have to plan their travel in a manner that takes into account the physical restraint and prolonged detention their watch listing status imposes. Listees cannot travel by themselves with small children, because border agents will segregate children from their parents during the detention. Families with listed individuals typically travel separately to spare the listee the

---

[8] Available at: https://www.baltimorepolice.org/sites/default/files/policies-and-procedures/802_Handling_Codes_Terrorist_Response.pdf

humiliation of having family witness their aggressive and prolonged detention. In this way, the families and fellow travelers of listees come to learn of a person's watch list status.

The same holds true at the airport. While a "SSSS" designation may be assigned to passengers at random, the only explanation for repeated "SSSS" designation is placement on the Selectee List. People who travel multiple times with listees will see that the listee is subject to extra screening each time. The inference people draw from these repeated screenings is that listees are on the Selectee List.  In the real world, whether a person is on the No Fly List or the Selectee List, this status becomes known to that person's family, his friends, and his professional colleagues. The government is asking this Court ignore all of this and take a head-in-the-sand approach instead. But here, our Constitution and good faith requires the Court to do the opposite.

### ii.      The stigma plus prong is satisfied because the dissemination of the watch list burdens Plaintiff's interests and alters their rights and status.

The "plus" prong is met when the government denies some "tangible interest" or directs an "alteration of a right or status" recognized by law; but the "plus" does not need to rise to the level of a constitutional violation. *Humphries v. County of L.A.*, 554 F.3d 1170, 1187–88 (9th Cir. 2009). In fact, whether or not there is a rights violation is simply not relevant to determining if the plus factor is satisfied. The Second Circuit's logic in *Doe v. Dep't of Pub. Safety ex rel. Lee* articulates this. *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38 (2d Cir. 2001). In *Doe,* the Second Circuit sought to determine what would be sufficient to constitute a plus factor in accordance with the seminal stigma-plus decision, *Paul v. Davis*, 424 U.S. 693, 711 (1976). *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d at 54. *Doe* explained that *Paul* concluded that the liberty identified by the Fourteenth Amendment could not "encompas[s] an individual's unadorned interest in his or her reputation," because if it did, the existence of a federal procedural due process claim would depend "entirely on whether the defendant happened to be a

state officer or a private citizen." *Id.* at 53–54. In order to avoid this outcome—which is the purpose of the plus factor—a plaintiff must identify "some material indicium of governmental involvement beyond the mere presence of a state defendant." *Id.* at 54. It would be enough, then, for "an allegation of defamation" to be accompanied by "other government action adversely affecting the plaintiff's interests." *Id.* at 55. Therefore, the plus factor does not have to be a violation of Plaintiff's legal rights.

Doe's rationale is also consistent with controlling precedent. In *Paul v. Davis*, the Supreme Court held that "reputation alone, apart from some more tangible interests," is insufficient to give rise to a procedural due process claim, and in doing so, established the plus factor requirement. *Paul v. Davis*, 424 U.S. 693, 701 (1976). The reason that the Court reached its decision, however, was because it wanted to avoid turning the Fourteenth Amendment into a "font of tort law to be superimposed upon" state law. *Id.* In other words, Paul's objective was to prevent all state law defamation claims against a state actor from becoming Fourteenth Amendment procedural due process claims that could be brought in federal court. Therefore, a procedural due process claim exists only when the state actor's imposition of a stigma also imposes upon "more tangible interests." *Id.*

And while most relevant cases finding a plus factor deal with the loss of government employment or an alteration or deprivation of a legal right, *Seigert v. Gilley* makes clear that a plus factor exists so long as the damage identified does not "flo[w] from injury caused by [Defendants] to [a plaintiff's] reputation." *Seigert v. Gilley*, 500 U.S. 226 (1991). In *Seigert*, the defendant provided a former employee's prospective employer with a negative reference that prevented the employee from being hired. *Id.* The employee alleged that the defendant's negative reference was defamatory and that, because it prevented him from being hired by the prospective

employer, he also satisfied the plus factor. *Seigert*, however, held that the employee did not have a plus factor. And in so doing, the Supreme Court indicated that the key fact upon which it relied to reach this decision was that the injury alleged "flow[ed] from the injury to [the employee's] reputation" rather than from an additional government-imposed effect unrelated to the defamation itself. *Id.* at 234.

Here, Defendants' listing of Plaintiff has a government-imposed effect distinct from the stigma it attaches to him. Both the No Fly List and the Selectee List cause extra screening at land borders and airports. This government-imposed effect is both distinct and unrelated to the stigma itself and consistent with this Court's interpretation of *McGrath* in *Mohamed*. In *Mohamed,* the Court reasoned that the stigmatizing listing decision at issue in *McGrath* gave rise to a constitutional issue because the stigmatizing list was disseminated to "government departments and agencies, which then used the list to take actions against organizations and their members." *Mohamed v. Holder,* No. 1:11-cv-50 (AJT/TRJ), 2011 U.S. Dist. LEXIS 96751, at *20 (E.D. Va. Aug. 26, 2011). The federal watch list is disseminated throughout the federal government and to state and local authorities so that those agencies take various action against listees. In this way, the plus prong is satisfied.

Even if this Court finds that Plaintiff must demonstrate a rights violation or status alteration to satisfy the plus prong, Plaintiff has made this showing. The No Fly List imposes a flight ban, which violates Plaintiff's right of movement. Defendants disseminate both the Selectee List and the No Fly List internationally to restrain the movement of listees, which also violates Plaintiff's right of movement. Furthermore, both lists prevent Plaintiff from "working at an airport, or working for an airline" [Dkt. 16 at 81], prevent Plaintiff from obtaining a license "to transport hazardous materials" [Dkt. 16 at 80], prevent Plaintiff from purchasing "guns in

states that ban [listees] from owning guns" [Dkt. 16 at 79], interfere with Plaintiff's ability to maintain a bank account and wire money [Dkt. 16 at 68], and interfere with Plaintiff's ability to test drive and purchase cars from dealerships. [Dkt. 16 at 70]. Both lists lead municipal courts to make adverse bond determinations. In short, these various disabilities constitute independent rights violations and together demarcate the special, second-class status of listees.

      B.  <u>The risk of erroneous deprivation is almost absolute and attributable to the bottom-of-the-barrel inclusion standard.</u>

In *Mohamed*, this Court already concluded that the "administrative process used to place a person on the No Fly List "has an inherent, substantial risk of erroneous deprivation." That conclusion was specific to the No Fly List, but though the post-deprivation process has changed, the listing process has not. And new information, outlined in the Second Amended Complaint, reveals that the watch listing process has gotten it wrong with every placement decision. Based on publicly available information, Plaintiff has been able to conduct a quantitative analysis of the TSDB's performance over the last decade. The information that forms the basis of this analysis includes the startling observation that none of the perpetrators of violent acts of terrorism inside the United States have been on the No Fly List when they attacked. *See* [Dkt. 16 at 132-142]. This fact, when taken together with a basic outline of how the watch listing system works, leads to the conclusion that the federal government's watch list would be "no more effective than a list of randomly selected individuals." [Dkt. 16 at 130]. Indeed, Plaintiff's analysis indicates that "defendants have no ability to watch list persons whose placement on the watch list would further Defendants' stated objectives." [Dkt. 16 at 131].

This essentially perfect level of inaccuracy is a function of the watch list's exotic inclusion standard. The federal government places individuals on the No Fly List if there is "reasonable suspicion to establish that the individual is a known or suspected terrorist," and the

individual poses a threat of committing at least one of several acts of terrorism. *Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *3 (E.D. Va. July 16, 2015). In other words, the minimum showing necessary to place an individual on the List is: (1) a reasonable suspicion (2) of a suspicion (3) that an individual poses a threat of conduct. The government places people on the Selectee List if they are "associated with "TERRORIST ACTIVITY." [Dkt. 16-2 at 54]

These questions point to the constitutional defect of the watch list's standards: because the standards are unmoored from actual criminal conduct, they are basically meaningless as objective measures. Compare the No Fly List and Selectee List standards—reasonable suspicion of a suspicion that an individual poses a threat on one hand and reasonable suspicion that a person is associated with terrorism—to the *Terry v. Ohio* standard, from which the List borrows language and attempts to cloak itself with a veneer of familiarity and legitimacy: "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). In other words, an officer may stop an individual for less than probable cause if they reasonably suspect that the individual is committing a crime. *Terry* does not give police officers the authority to stop an individual simply because the individual poses a threat of committing a crime. Reasonably suspecting an individual of posing a threat of committing a crime is fundamentally different than reasonably suspecting an individual of committing a crime. When the government makes a determination that someone poses a threat, it is forecasting future conduct in a manner reminiscent of the Precrime Technology that drives forward the plot of the film, Minority Report. On the other hand, when a law enforcement officer stops and investigates an individual for suspicious conduct, she is

29

responding to actual, ongoing, and concrete events. "Posing a threat" or being "associated" with terrorism means much less than any of this. It could be hypothetical, it could be based on hypotheticals and conduct, or it could be completely pretextual and aimed at a specific group of people who share common characteristics and who are thought to represent a large share of the offending population. Using a vague and prospective threat standard is what makes the watch list's inclusion standards exotic, unprecedented, and miles below what the term of art reasonable suspicion actually means. Most individuals on the watch list, in the government's eyes, pose a threat of becoming terrorists or are simply "associated" with terrorism--at least according to nominations supported by "articulable facts" gathered and analyzed by one of several intelligence agencies and approved for placement at a rate better than 99% by an agency not authorized by Congress to compile such a list.

 In short, because the risk of erroneous deprivation is essentially perfect and attributable to the watch list's inclusion standards, the substitution of inclusion standards that require the government to charge or arrest someone prior to listing would substantially diminish the risk of erroneous deprivation. This is a conclusion that this Court commended previously in *Mohamed*, explaining that "[g]iven the liberty interests at stake and the substantial and enduring impact a No Fly List placement has on those liberty interests, much recommends a pre-deprivation ex parte in camera judicial review." *Mohamed v. Holder*, Civil Action No. 1:11-cv-50 2015 U.S. Dist. LEXIS 92997, at *29 (E.D. Va. July 16, 2015).

### C.  Defendants have not provided Plaintiff with any process whatsoever.

It is abundantly clear, that Defendants do not provide Plaintiff any process whatsoever. Plaintiff has alleged that he did not, at any time, receive notice of the factual basis for his placement on the federal watch list or even notice that he had been listed. [Dkt. 16 at 33, 54].

Rather, he first learned of his designation subsequent to being added to the watch list. Nor was he given notice of the deprivation of his liberty interests or violation of his constitutional rights. [Dkt. 16 at 55].

Defendants make much of DHS TRIP, but DHS TRIP—administered by TSA—cannot prevent the dissemination of the TSDB to private entities and foreign governments. All of the non-travel related consequences, which form the basis of many of the Plaintiff's claims, simply cannot be adjudicated in any manner by an agency that plays only one part in the constellation of consequences imposed on listees. And while persons on the No Fly List can now use DHS TRIP to learn obtain confirmation of their status, the same is not true for persons on the Selectee List. As it stands today, there is no way for Plaintiffs to obtain even post-deprivation notice of his status.

As the Court in *Wray* held, where the plaintiffs in that case alleged that "their placement on the Watch List or the Selectee List subjects them to invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port," the plaintiffs plausibly alleged that "their inclusion on the Watch List or Selectee List caused them to suffer a deprivation of liberty interest as that term is historically understood. *Elhady v. Wray*, United States District Court, Eastern District of Virginia, Case No. 16-cv-375 (2016)), Dkt. 47, Page ID # 960.

### IV.     Plaintiff have adequately pled Equal Protection claims.

The "central purpose" of the Fifth Amendment's equal protection clause is "prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). The equal protection clause forbids the government from making "distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3)

intentionally treat one individual differently from others similarly situated without any rational basis."[9] *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010). If a plaintiff can show that he was "subjected to unequal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop, that would be sufficient to demonstrate a violation of the Equal Protection Clause." *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002). Additionally, a violation of equal protection occurs where the government improperly relies on a protected group affiliation to apply the law. *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

A plaintiff can successfully plead an equal protection claim where there is direct evidence that the government agency explicitly uses inappropriate criteria for classification. *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997). Direct evidence "seldom exists." *Id.* But where it does, and the equal protection claim is "based on an overtly discriminatory classification," the plaintiff is not required to show discriminatory intent. *Wayte v. United States*, 470 U.S. 598, 610 n.10 (1985); *Farm Labor*, *supra* 308 F.3d at 534 n.4 (citing *Wayte*, 470 U.S. at 610 n.10; *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). And, "[i]t is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000); *see also Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002) (explaining that evidence of "explicit racial criteria or admi[ssion] to racially-motivated decision making" eliminates requirement to establish different treatment of similarly situated class) (quoting *Brown*, *supra* 221 F.3d at 337). "[W]hether [an] official action was motivated by intentional discrimination demand[s] a sensitive inquiry into such circumstantial and direct evidence of

_____

intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [discriminatory treatment] bears more heavily on one [protected class] than another." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

Plaintiff has plead enough facts demonstrating the plausibility that Defendants compile their watch list with discriminatory intent. "Discriminatory intent may be established by evidence of . . . substantial disparate impact." *Elston v. Talladega Cty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993). The Fourth Circuit in particular has specified that "evidence of a 'consistent pattern' of actions by the decisionmaking body disparately impacting members of a particular class of persons" constitutes one of the factors "recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent." *Sylvia Dev. Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995); see also *N. Carolina State Conference of NAACP v. McCrory*, No. 16-1468, 2016 WL 4053033, at *15 (4th Cir. July 29, 2016) ("Showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent"). Where such disparate impact evidence is particularly stark, "[d]iscriminatory intent may be found 'even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials.'" *Elston* at *id.*

Plaintiff has included as exhibits to his Seconded Amended Complaint leaked government documents that make clear that Defendants' watch list includes a disproportionate number of Muslims. [Dkt. 16-3]. In fact, according to the leaked government document entitled Directorate of Terrorist Identities (DTI) Strategic Accomplishments 2013, Defendants' actions have disparately impacted Muslim American travelers as Dearborn, a city of less than 100,000

and a place Arab Americans and Muslim Americans have called home for generations, contains the second highest concentration of Americans on the federal government's watch list. [Dkt 16-3; Dkt. 16 at ¶ 3]. Moreover, Plaintiff has plead facts showing a profound disparate impact of the selectee and No Fly lists on American Muslims originating from countries where Islam is the predominant religion. [Dkt. 16 at ¶ 11]. Plaintiff has plead that in almost all public instances of the inclusion of American Citizens and Permanent Residents on the watch list have been have been Muslims. [Dkt. 16 at ¶ 103]. It is no surprise, therefore, that Defendants' watch listing practices have triggered legal challenges by only Muslim plaintiffs throughout the entire country. In addition to Plaintiff in this action, in federal courts in Oregon, Ohio, Michigan, Virginia, the District of Columbia, among other places, the dozens of persons challenging the watch list are all Muslim, an indelible fact that gives rise to the inference that Defendants' watch list is nothing more than a list of Muslims. Furthermore, travel to a Muslim country is a factor considered in determining whether one should be included on the list. [Dkt. 16 at ¶ 11]. Accordingly, Plaintiff has presented several facts showing the plausibility of discriminatory intent.

Plaintiff has also pled that Defendants use impermissible and inaccurate religious profiles in compiling the federal watch list. [Dkt. 16 at ¶ 115]. As such, Defendants' actions in designating Plaintiff on the federal watch list and disseminating the stigmatizing label of "known or suspected terrorist" were motivated by Plaintiff's religious status and on the basis of Plaintiff's constitutionally-protected free exercise of religion. [Dkt. 16 at ¶ 179]. Accordingly, Defendants' actions are discriminatory and constitute an action that targets religious conduct for distinctive treatment. [Dkt. 16 at ¶ 176]. By placing Plaintiff on the federal watch list, Defendants have treated Plaintiff like a second-class citizen. [Dkt. 16 at ¶ 178].

Therefore, the Second Amended Complaint states a plausible equal protection claim based on both the selection of Muslims for secondary questioning and for the treatment Muslims receive after referral to secondary questioning. Therefore, Plaintiff has adequately pleaded a claim for Equal Protection.

### V. Defendants do not understand Plaintiff's non-delegation claim. Simply put, Congress never directed Defendants to create a terrorist watch list and then fill it with innocent people federal agents believe will become terrorists in the future.

Congress cannot delegate its legislative power. *Yakus v. United States*, 321 U.S. 414, 424 (1944). But Congress may specify "the basic conditions of fact upon whose existence or occurrence… it directs that its statutory command shall be effective." *Id*. at 424-425. However, "where Congress lays down by legislative act an *intelligible principle* to which the person or body authorized to [exercise the assigned duty] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *S. Carolina Med. Ass'n v. Thompson*, 327 F.3d 346, 350 (4th Cir. 2003). Courts may narrowly construe a statute in order to avoid a delegation issue. *Industrial Union Department, AFL-CIO v. American Petroleum Institute*, 448 U.S. 607 (1980) (hereinafter the "Benzene Case*"*).

In particular, Courts may limit the scope of agency discretion where the governing statute contains no meaningful limits. In the Benzene Case, the agency argued the statute at issue required it to limit exposure to carcinogens in the workplace to the lowest feasible level because no safe level of exposure could be determined. *Id*. at 646. The statute directed the agency to regulate toxic materials in general by "set[ting] the standard which most adequately assures, to the extent feasible… that no employee will suffer material impairment of health or functional capacity." The law separately defined "occupational safety and health standard" as "reasonably necessary or appropriate to provide safe or healthful employment." *Id.* The Court held that the

chosen standard for carcinogens must conform to the "reasonably necessary or appropriate" language, though that language was found in a different part of the law. *Id*. Without such a finding, the law at issue would give one agency extensive powers over industry, *id*. at 651, and would provide little guidance from Congress to limit those powers. *Id*. at 646. Put differently, the Court interpreted a statute which gave the agency wide discretion to regulate one type of risks to have an implied limitation.

Along those lines, in *Kent v. Dulles*, the Supreme Court limited the discretion of the Secretary of State to deny the issuance of passports to alleged communists. *Kent v. Dulles,* 357 U.S. 116 (1959). This discretion was not restricted by the law governing issuance of passports, and thus presented a delegation issue. *Id*. at 129. The Court also considered the liberties infringed by the Secretary's denial in judicially imposing limits on the Secretary's discretion, including the freedom of movement. *Id*. Lastly, the Court held that a legislative desire to interfere with that right would need to be explicit and that the Court would "construe narrowly all delegated powers that curtail or dilute" such liberties. *Id*.

The terrorist watch list presents a delegation issue similar to *Benzene* and *Kent* because the law which provides the authority for the watch list does not describe what a "threat" is, and does not describe what level of "threat" is necessary to sentence an innocent American—who has neither been charged with a crime nor arrested for being a criminal—to a lifetime of terrorist watch list consequences. 49 U.S.C. § 114(h)(3) only directs the TSA to establish policies requiring air carriers to identify passengers who "may be a threat to aviation or national security" based on government information, and to notify law enforcement, deny boarding, or take other appropriate action if such an individual is identified. On the other hand, 49 U.S.C. § 114(h) does not contain the word "terrorist." § 114(h) does not direct any agency to create a watch list. §

114(h) does not establish the TSC or direct the agency to administer the watch list; indeed when this law passed, TSC did not even exist. Instead, the TSC is carrying out the lion's share of those functions under executive directives. And by directing TSC to disseminate its watch list to private parties and foreign governments, TSC is plainly acting without the authority of Congress. In other words, much of the administrative scheme surrounding the watch list is not authorized by its governing statute.

Like the law at issue in *Benzene*, 49 U.S.C. § 114(h)(3) directs an agency to act but contains a guiding principle which gives the agency unprecedented authority. Like *Benzene*, this is more than a difference of degree—the lack of authorization for the agency's sweeping approach weighs in favor of a narrower construction. For example, the Court in *Benzene* was concerned with the difference between "absolute safety" and the "elimination of significant harm," (*Industrial Union Department, AFL-CIO v. American Petroleum Institute,* 448 U.S. at 646), and construed the statute to require a finding of significant harm. *Id.*

Here, the statute provides no guidance as to when Defendants should list a person. Section 49 U.S.C. § 114(h)(3) lists three actions TSA can take when an individual who poses a threat to aviation or national security is identified, but does not establish how the TSA should decide to take which action. Additionally, 49 U.S.C. § 114(h)(3) does not instruct nor permit Defendants to disseminate its watch list to foreign governments, to financial companies, or to state and local police for the purpose of constraining the movement and activities of listees. This is even less guidance than the statute provided in the Benzene Case. At least the statute in the Benzene Case contained a standard--significant harm—which could be applied to limit or guide the agency's discretion. And based on *Kent*, the constitutional concerns presented by the terrorist watch list amplify the nondelegation issues discussed above. If Congress meant to authorize

Defendants to list to United States Citizens as a matter of course, the statute would have directed TSA to create a terrorist watch list that constrains its listees in all the ways articulated by Plaintiff's complaint. But the statute does no such thing. Furthermore, contrary to the federal government's assertions, the governing statute also lacks an intelligible principle because it does not describe when an individual "may be a threat" sufficient to deny boarding. Though 49 U.S.C. § 114(h)(3) gives TSA authority to "notify appropriate law enforcement agencies, prevent...from boarding an aircraft, or take other appropriate action" with respect to an individual "who may be a threat to civil aviation or national security," it does not describe what level of threat is necessary for denial of boarding, what level of threat is necessary for enhanced screening, and lacks any guidance to that effect.

This "level of threat" argument is easier to articulate by example. The federal government's standard for inclusion on the watch list hinges on its "reasonable suspicion" that individuals on the watch list "pose a threat" of terrorism. As the government must concede, the watch list necessarily includes innocent people. It is possible, even likely, that the watch list contains thousands of innocent U.S. citizens. Because the Government determines these innocent citizens pose a threat of terrorism, they can be placed on the watch list. By the same token, because the Government places so many people on the watch list, it may even identify some individuals who actually do pose a threat of terrorism.

The non-delegation argument arises from the relationship between the large population of innocent individuals who are determined to "pose a threat" and are included on the watch list, and the individuals who actually are a threat and are included on the watch list. Consider these extremes: if every individual on the watch list is an actual terrorist, then every individual on the watch list poses a threat of terrorism. If no individual on the watch list is an actual terrorist, then

no individual on the watch list poses a threat of terrorism, because the Government's rate of successful identification would be so low that no individual on the watch list could be described as threatening. Put differently, erroneous identification of individuals who are thought to "pose a threat" could be so prevalent on the population level that the probability of an individual on the watch list actually being a terrorist is effectively zero. But the Government has neither perfect identification skills nor completely imperfect identification skills, and Congress has offered no guidance as to what population error rate would be acceptable for Defendants' watch list. A list with a one-in-one-million success rate would be very different than a list with a one-in-one-hundred success rate, as the individuals on each list would pose a different degree of threat.[10]

But Congress did not indicate what kind of list it desired, and as a result it is not clear what degree of concern satisfied the "poses a threat" standard. Should the list include entire populations of threatening individuals, or should it include only specific subsets? Should individuals on the watch list be known terrorists, or reasonably suspected of being suspected terrorists? This is an essentially legislative decision which has been left to the agencies which administer the list. And it is not just a pedantic distinction. As Plaintiff's personal hardship – hardship far beyond "civil aviation" as articulated in the statute – demonstrates, and as the experiences of thousands of other Muslim Americans demonstrate, the federal watch list has extremely burdensome effects on the daily lives of those innocent individuals who are determined to "pose a threat" to the extent necessary for placement on the federal watch list. The suffering of innocents is inevitable in this case, as the Government admits, because the watch list regulates the conduct of thousands of individuals beyond civil aviation in order to prevent a limited category of harmful conduct by a few individuals.

---

[10] As the allegations in the Second Amended Complaint make clear, a quantitative analysis of the federal government's watch list indicates that it would perform similarly if the watch list's inclusion standards were replaced with a process of randomly selecting individuals to be on the watch list.

Here, if Congress intended a watch list so broad as to include individuals who are reasonably suspected of being suspected terrorists who may pose a threat of terrorism—which is a standard far below reasonable suspicion alone—it did not say so explicitly. In fact, the governing sections of the statute contain no mention of "terrorists" or a terrorist watch list. 49 U.S.C. § 114(h). The governing section of the statute does not direct Defendants to disseminate its watch list in a manner calculated to constrain Plaintiff's international travel or ability to use the financial system. And because the statute lacks any guidance as to what kind of standard should apply as to those who "pose a threat," it is an unconstitutional delegation of legislative authority—a conclusion that any reasonable person standing in the shoes of Defendants would reach.

### VI.        This Court has jurisdiction over Plaintiff's claims.

Citing the Supreme Court's decision in *Elgin v. Dep't of the Treasury,* the Fourth Circuit did not utilize the "inescapably intertwined" doctrine as the basis for its transfer of *Mohamed*'s to the Circuit Court. Instead, the Fourth Circuit explained that when "Congress has arguably sought to limit the jurisdiction of the district courts" the inquiry courts must conduct is "whether Congress' intent to preclude district court review of an agency's actions is fairly discernible" from the "text, structure, and purpose of the relevant statute or statutes." *Mohamed v Holder*, citing *Elgin v. Dep't of the Treasury,* 132 S. Ct. 2126, 2133 (2012). After citing the Congressional directive to TSA to create a redress process and the contents of 46110 itself, the Fourth Circuit held that "we do not fairly discern from either grant of authority a congressional intent to remove such claims from review in the district court." *Id.* at 5-6.

Additionally, in *Elhady*, the Court held that "the Fourth Circuit reasoned that placement on the No Fly List 'necessarily requires scrutiny of both the TSC's and TSA's actions,' and '49 U.S.C. § 46110 gives the [courts of appeals] broad powers of review over orders of the TSA' but

not 'similar independent authority over the TSC." *Elhady v. Wray*, United States District Court, Eastern District of Virginia, Case No. 16-cv-375 (2016)), Dkt. 47, Page ID # 956. In short, the Fourth Circuit held that Section 46110 "does not evidence Congress' intent to exclude [a watch list] challenge to past and future restrictions on his ability to travel from consideration in the district court." *Id.*

## VII.   Plaintiff has standing to assert his claims.

Defendants' standing arguments barely warrant a response. It is sufficient to state that the Plaintiff has alleged that Defendants have placed him on the terrorist watch list. The Second Amended Complaint makes clear that this watch list is disseminated far and wide and in a manner calculated to impose a variety of consequences on the Plaintiff—consequences that began upon his placement and continue as a result of his ongoing status as a listed person.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons discussed in the accompanying Brief, Plaintiff respectfully requests this Honorable Court DENY Defendants' Motion to Dismiss Second Amended Complaint.

Respectfully submitted,

/s/ James W. McConkie
PARKER & McCONKIE
JAMES W. McCONKIE (Bar # 2156)
BRADLEY H. PARKER (Bar # 2519)
Attorneys for Plaintiff
5664 South Green Street
Salt Lake City, Utah 84123
Phone: (801) 264-1950
Email: jwmcconkie@utahlawhelp.com
Email: bparker@utahlawhelp.com

/s/ Lena F. Masri
CAIR LEGAL DEFENSE FUND
LENA F. MASRI (DC: 1000019)
GADEIR I. ABBAS (VA: 81161)*
Attorneys for Plaintiff
453 New Jersey Avenue, SE
Washington, DC 20003
Phone: (202) 488-8787
Email: lmasri@cair.com
Email: gabbas@cair.com

*Licensed in VA; not in DC
Practice limited to federal matters

Dated: January 5, 2018

### CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2018, I electronically filed the foregoing document with the Clerk of the Court for the District of Utah using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

*/s/ Marynell Hinton*

Marynell Hinton